UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JUANA CAMPUSANO,

                 Plaintiff,

     - against -

CAROLYN W. COLVIN, Commissioner of
Social Security,

                 Defendant.
------------------------------------------------------------X

**MEMORANDUM AND ORDER**
14-CV-2477 (RRM)

ROSLYNN R. MAUSKOPF, United States District Judge.

      Plaintiff Juana Campusano alleges that the Commissioner of Social Security

("Commissioner") improperly denied her claim for disability insurance benefits.  Campusano

commenced the instant action on April 17, 2014, after which both Campusano and the

Commissioner cross-moved for judgment on the pleadings.  Though the Administrative Law

Judge ("ALJ") properly considered Campusano's credibility, the Court finds that he improperly

weighed the medical evidence of Campusano's treating psychiatrist, and therefore REMANDS

the case for further administrative proceedings.

BACKGROUND

**I.  Factual Background**

    **a.  Non-Medical Evidence**

      Juana Campusano is a former housekeeper who was born on August 24, 1966 in the

Dominican Republic.  (Admin. R. (Doc. No. 25) at 37, 115.)  She reported that she is unable to

speak, read, or understand English (*id.* at 132), and that she completed up to the tenth grade in

the Dominican Republic (*id.* at 36; *but see id*. at 134 (eighth grade), 183 (ninth grade)).  She

further reported that she worked as a home attendant for approximately fifteen years and then as

1

a housekeeper for approximately ten years until she had to stop working in 2010. (*Id.* at 36–37; *but see id.* at 134 (reporting that she worked as a home attendant from 1986 to 2009, and then worked in an unspecified field from 2009 to 2010), 168 (reporting that she worked as a home attendant from 1998 to 2000, and then as a housekeeper from 2000 to 2010).) Campusano stated that she stopped working on March 22, 2010, due to a litany of medical issues, including memory loss, headaches, vision impairment, insomnia, and panic attacks. (*Id.* at 133.)

### b. Medical Evidence

#### i. Wyckoff Heights Medical Center

Campusano was admitted into Wyckoff Heights Medical Center on March 22, 2010 due to complaints of "tingling and numbness" on the left side of her face and her arm. (*Id.* at 232.) MRI imaging of her brain and physical examinations showed no stroke, hemorrhage, or mass, and she was diagnosed with a transient ischemic attack ("TIA"). (*Id.* at 251.)

#### ii. Woodhull Medical Center

On four separate occasions in May of 2010, Campusano visited the Woodhull Medical Center on her own accord, complaining of muscle, pubic, and pelvic pain. (*Id.* at 196–97, 318–25, 566–69, 572–78.) During these visits, Campusano was diagnosed with vaginitis, myalgia, myositis, and iron deficiency due to blood loss. (*Id.*) She was alert, not in distress, and denied depression at each visit. (*Id.*) For her muscle pain and inflammation, she was prescribed ibuprofen, acetaminophen, and Robaxin. (*See id.*)

Following her initial visits to Woodhull in May of 2010, she continued to visit specialists at Woodhull for various medical issues.

### A. Dr. Pradeep Sharma, M.D.

Campusano visited Pradeep Sharma, M.D., an internist at Woodhull, for the first time on July 16, 2010, complaining of neck pain which had persisted for three weeks. (*See id.* at 380.) On July 29, 2010, she returned to Dr. Sharma and complained of dizziness, difficulty sleeping, and fear of using public transportation. (*Id.* at 382.) At her next appointment on August 16, 2010, she complained that she was afraid of closed spaces and said that she had not seen a therapist. (*Id.* at 383.) In his notes from this visit, Dr. Sharma noted depression and claustrophobia. (*Id.*) Campusano returned to Dr. Sharma on September 16, 2010, complaining that she had been experiencing neck pain for the past three days. (*Id.* at 384.) Dr. Sharma noted upon examination that she had decreased range of motion in her cervical spine. (*Id.*) On October 7, 2010, Dr. Sharma found that her lumbar spine had full range of motion despite her complaints of lower back pain. (*Id.* at 385.)

On November 7, 2010, Campusano visited Dr. Sharma again. Dr. Sharma's notes indicate that Campusano had seen a neurologist and been started on Seroquel and Cymbalta. (*Id.* at 386.) Campusano was experiencing headaches, and Dr. Sharma recommended that she see an ophthalmologist and dentist. (*Id.*) She returned to Dr. Sharma with a cough and sore throat on January 28, 2011, and denied experiencing neck pain, panic disorder, depression, or anxiety. (*Id.* at 417−18.)

Campusano saw Dr. Sharma again on March 16, 2011, complaining of sporadic headaches (*id.* at 415), and visited Woodhull Hospital two weeks later, complaining of head and neck pain. (*Id.* at 450–53.) Campusano visited Dr. Sharma five more times between early April 2011 and late October 2011, complaining of a number of issues, including chest pain, vomiting, leg pain, headaches, and heartburn. (*Id.* at 403−14.) At these visits, Campusano denied

experiencing neck pain, musculoskeletal pain or weakness, panic disorder, depression, or anxiety. (*Id.*) Further, physical and mental examinations showed all normal findings. (*Id.*)

On November 1, 2011, Campusano again complained to Dr. Sharma of lower back pain. (*Id.* at 400–02.) She denied experiencing neck pain, musculoskeletal pain or weakness, panic disorder, depression, or anxiety. (*Id.* at 400.) The doctor observed neat and clean dress and no memory loss. (*Id.*) Physical examination revealed tenderness in Campusano's lower back with decreased range of motion. (*Id.* at 401.) Campusano visited Dr. Sharma three more times between January 9, 2012 and April 26, 2012 with examination findings consistent with the November 1, 2011 visit. (*Id.* at 391–99.) Campusano visited Dr. Sharma for the last time in the record on June 28, 2012 for an episode of gastroenteritis and denied experiencing headaches, depression, or anxiety. (*Id.* at 388–90.) Physical examination showed normal findings and full range of motion in her neck. (*Id.*)

### B. Jasmine Loubriel, L.M.S.W.

Upon Dr. Sharma's referral, Campusano visited Jasmine Loubriel, L.M.S.W., a social worker at Woodhull, on February 17, 2011. (*Id.* at 269.) Campusano was referred due to somatic pains in her back and face, forgetfulness, aggressiveness towards friends and family, and depressed and anxious mood. (*Id.*) Additionally, she complained of claustrophobia in crowded spaces, crying spells, excessive worrying, tension, difficulties sleeping, and changes in her appetite. (*Id.*) Ms. Loubriel saw Campusano again on June 10, 2011 and they spoke about an accident that occurred when Campusano was twelve years old, for which she was hospitalized. (*Id.* at 272.) The accident caused memory loss and left Campusano unable to pass the eighth grade. (*Id.*) Campusano reported a good relationship with her children, but said that she was feeling anxious almost daily despite compliance with her medications. (*Id.*) At her appointment

with Ms. Loubriel on July 1, 2011, Campusano reported that she continued to experience headaches and dizziness, and that she had confusion which caused her to get lost. (*Id.* at 273.) At no time did Ms. Loubriel note whether or not she believed that Campusano was depressed.

### C. Dr. Dmitriy Grinshpun, M.D.

On October 27, 2010, Campusano saw Dmitriy Grinshpun, M.D., a neurologist at Woodhull, for headaches that she had been experiencing three times a week for the past year. (*Id.* at 198−99.) She reported that the headaches were 8/10 intensity, which improved to 3/10 with Tylenol and ibuprofen. (*Id.*) Dr. Grinshpun noted that the headaches sometimes limited her daily activities. (*Id.*) Campusano denied having depressed mood or anhedonia. (*Id.* at 427.) She was independent in self-care and walking. (*Id.*) On examination, Campusano was not in acute distress. (*Id.* at 199.) Dr. Grinshpun diagnosed tensional headache and anxiety. (*Id.* at 430.) Her treatment plan included Tylenol, as required, Cymbalta, and Seroquel. (*Id.* at 199.)

On December 8, 2010, Campusano returned to Dr. Grinshpun for severe frequent headaches and dizzy spells. (*Id.* at 200.) The doctor noted that she could not tolerate Cymbalta. (*Id.*) MRI and CT-scans revealed no abnormalities. (*Id.*) Dr. Grinshpun diagnosed headache and prescribed Nortriptyline, magnesium oxide, and Imitrex. (*Id.*)

Dr. Grinshpun completed a disability questionnaire on April 4, 2011. (*Id.* at 217−24.) He reported that he had examined Campusano on October 27 and December 8, 2010, and that he had diagnosed her with chronic daily headaches that she experienced three times per week. (*Id.* at 217−18.) When asked about positive clinical findings to support the diagnosis, Dr. Grinshpun stated that a CT-scan of her head had been normal. (*Id.*) He had seen her only two times and had not yet relieved her headaches or dizziness with medication. (*Id.* at 219.) He reported prescribing Nortriptyline, magnesium oxide, and Imitrex, and that Campusano was also taking

Cymbalta and Seroquel. (*Id.* at 221.) Dr. Grinshpun opined that Campusano could sit for three hours and stand or walk for three hours in an eight hour day and needed to alternate between sitting and standing or walking every 45 minutes. (*Id.* at 220−21.) She could occasionally (up to one-third of an eight hour workday) lift and carry five to ten pounds. (*Id.* at 219.) She had no significant limitations in repetitive reaching, handling, fingering, or lifting. (*Id.* at 220.) The doctor indicated that Campusano's condition interfered with her ability to keep her head and neck in a constant position and that she could not sustain full-time employment at a job that required her to do so. (*Id.* at 221.) Dr. Grinshpun reported that Campusano's pain, fatigue, or other symptoms frequently interfered with her attention and concentration. (*Id.*) Psychological limitations and the inability to push and bend also affected her ability to work at a regular job on a sustained basis. (*Id.* at 222−23.) She could perform low stress work. (*Id.* at 222.) Campusano would have "good" and "bad" days and be absent from work more than three times a month. (*Id.*) Dr. Grinshpun did not think Campusano was a malingerer. (*Id.*)

On April 25, 2011, Campusano had another appointment with Dr. Grinshpun. (*Id.* at 463.) Campusano told his patient care assistant, Rosede Ogunremi, that she was experiencing no pain and that in the past two weeks she had not had less interest or pleasure in doing things and had not been feeling down, depressed or hopeless. (*Id.*) She told the doctor that she was still having headaches, but admitted that she was not compliant with her medications. (*Id.* at 465.) Dr. Grinshpun restarted her on Nortriptyline, magnesium oxide, and Ultram (Tramadol). (*Id.*)

Campusano visited Dr. Grinshpun on September 21, 2011 for a routine follow-up. (*Id.* at 492−94.) She complained of continuing headaches, vomiting, nausea, and dizziness. (*Id.* at 493.) Campusano stated that she had run out of her headache medication and was taking only Excedrin or Tylenol, without much improvement. (*Id.*) On examination, Campusano was fully

alert and oriented, with full motor strength in all extremities and intact sensation. (*Id.*) Dr. Grinshpun prescribed Topamax and continued Ultram. (*Id.* at 494.) He discontinued Nortriptyline because of possible negative interaction with Lexapro which she had recently been prescribed by another specialist. (*Id.*)

Campusano was still experiencing frequent headaches when she saw Dr. Grinshpun on November 2, 2011, and also reported depression. (*Id.* at 498−99.) The neurologist increased the Topamax dosage and added Depakote. (*Id.*)

On May 21, 2012, Campusano returned to Dr. Grinshpun for a follow-up visit. (*Id.* at 524.) She reported that she was not currently experiencing any pain, and that in the past two weeks she had not had less interest and/or pleasure in doing things and had not been feeling down, depressed or hopeless. (*Id.* at 523.) Dr. Grinshpun diagnosed myalagia and myositis, unspecified. (*Id.* at 524.) He prescribed Methocarbamol, a muscle relaxant, and a heating pad. (*Id.* at 525.)

On October 10, 2012, Dr. Grinshpun prescribed Methocarbamol and Naproxen. (*Id.* at 423−24.)

### D. Dr. Rizalina Fernandez, M.D.

On June 6, 2011, Campusano saw Rizalina Fernandez, M.D., a psychiatrist at Woodhull, for the first time. (*Id.* at 271.) She was referred to Dr. Fernandez for headaches that precluded her from working, sleep problems, and anhedonia. (*Id.*) Dr. Fernandez noted that Campusano was in an automobile accident at thirteen, and had experienced depression, anxiety, and headaches since then. (*Id.* at 422.) On mental status examination, Campusano was cooperative and cleanly groomed. (*Id.*) Her thought process was goal directed. Under thought content, Dr. Fernandez wrote "headaches." (*Id.*) Perceptual disturbances included hearing sound and feeling

someone was behind her.  (*Id.*)  Campusano was fully alert and oriented.  (*Id.*)  She was distractible and lost things.  (*Id.*)  Her concentration was poor.  (*Id.*)  Her long term memory was intact, and she had a good ability to abstract.  (*Id.*)  Campusano's mood was tense, and she experienced anhedonia at times.  (*Id.*)  Campusano's impulse control and judgment were good. (*Id.*)  She denied having suicidal or homicidal thoughts.  (*Id.*)  Dr. Fernandez diagnosed major depressive disorder and prolonged post-traumatic stress disorder ("PTSD"), and assigned a Global Assessment of Functioning (GAF) score of 45/50.[1]  (*Id.* at 270, 422.)  She prescribed Clonazepam and Lexapro.  (*Id.* at 234−35.)

On July 8, 2011, Campusano told Dr. Fernandez that she was not always compliant with medication, saying "I forget."  (*Id.* at 273.)  Dr. Fernandez noted that she was slow in responding to questions.  (*Id.*)  The psychiatrist continued Lexapro and Clonazepam.  (*Id.*)  When Dr. Fernandez saw Campusano on August 4, she appeared more attentive.  (*Id.* at 274.)  She said that she continued to experience headaches "on and off" and heard "sounds from [her] ears," but that she was sleeping better.  (*Id.*)

Dr. Fernandez completed a mental medical source statement questionnaire on May 4, 2012, outlining her findings of Campusano's condition and functional abilities.  (*Id.* at 310–14, 477–81.)  The doctor indicated that Campusano was diagnosed with major depressive disorder and prolonged PTSD.  (*Id.* at 310.)  She could not tolerate antidepressant medication (Lexapro), but was continued on Clonazepam for anxiety and sleep.  (*Id.*)  Dr. Fernandez listed Campusano's clinical findings as constant fearfulness outside, poor memory, problems sleeping due to recurring nightmares, and feeling as if someone was behind her.  (*Id.*)  The doctor

---

[1] GAF is a rating of overall psychological functioning on a scale of 0 to 100.  A GAF of 41 to 50 reflects "Serious symptoms" or "any serious impairment in social, occupational, or school functioning."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders-Tex*t Revision 34 (4th ed., rev. 2000) (DSM-IV).

indicated that Campusano had been symptomatic since age twelve.  (*Id.*)  She did not have a low IQ or reduced intellectual functioning.  (*Id.* at 311)  Dr. Fernandez stated that poor sleep and anxiety could exacerbate Campusano's headaches.  (*Id.*)  The doctor checked boxes indicating that Campusano was markedly limited in her activities of daily living, social functioning, and concentration, persistence, or pace.  (*Id.*)  She further found that Campusano had experienced four or more repeated episodes of decompensation within a twelve month period, each of at least two weeks' duration, and noted that Campusano "was asked to stop working."  (*Id.*)

Dr. Fernandez indicated that Campusano was seriously limited, but not precluded from: remembering work like procedures; understanding, remembering, and carrying out very short and simple instructions; maintaining attention for two hour segments; maintaining regular attendance and being punctual within customary, usually strict tolerance; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being unduly distracted; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; responding appropriately to changes in a routine work setting; and dealing with normal work stress.  (*Id.* at 312.)

The psychiatrist opined that Campusano had a medically documented history of a chronic affective disorder that had caused a complete inability to function independently outside the area of her home.  (*Id.* at 313.)  She reported that Campusano would be absent from work more than four days per month.  (*Id.*)  Her impairment had lasted at least twelve months, and she was not a

malingerer.  (*Id.*)  Dr. Fernandez believed that Campusano could manage social security benefits.  (*Id.* at 314.)

### iii.    Consultative Examiners

#### A.  Dr. John Laurence Miller, Ph.D.

On February 1, 2011, Campusano visited John Laurence Miller, Ph.D., a psychologist, for a consultative examination.  (*Id.* at 183–86.)  Dr. Miller compiled a psychiatric evaluation form that detailed Campusano's background information, psychiatric and medical history, functional abilities, and the findings of a mental status examination.  (*Id.*)  Regarding functional abilities, Dr. Miller noted: trouble falling asleep, depressive symptoms, anxiety-related symptoms, fearfulness of getting lost when outside the home, and memory deficits.  (*Id.* at 183–84.)  Regarding mental status, Dr. Miller noted that she was well-groomed, fluent in her speech, coherent and goal directed.  (*Id.* at 186.)  He also recorded, however, that she was depressed, had impaired attention, concentration, and memory skills, and was below average with respect to intellectual functioning.  (*Id.* at 185.)  He opined that Campusano might have trouble learning new tasks, but should be able to perform complex tasks independently if familiar with them.  (*Id.* at 184–85.)  Dr. Miller ultimately diagnosed major depressive disorder ("MDD") and panic disorder with agoraphobia, which might significantly interfere with her ability to function on a daily basis, but opined that Campusano's prognosis was good if given psychiatric care.  (*Id.* at 186.)

#### B.  Dr. Anat Benjamin, M.D.

Anat Benjamin, M.D., an ophthalmologist, performed a consultative exam on Campusano on February 18, 2011.  (*Id.* at 212.)  Upon examination and review of Campusano's medical

history, Dr. Benjamin diagnosed her with presbyopia and cataract in both eyes, but concluded that she "is not considered visually disabled." (*Id.* at 211−12.)

### C.  Dr. Edward Southard, M.D.

Dr. Edward Southard performed an orthopedic consultative exam on May 25, 2011. (*Id.* at 225.)  Campusano's chief complaint was that she had been experiencing cervical spine pain for the past year. (*Id.*)  She described her spinal pain as a persistent, aching, throbbing sensation, with an intensity of six to eight out of ten, that radiated down her left arm with numbness and tingling in her fingers. (*Id.*)  With respect to her daily activities, she reported that she cooked five times a week, bathed, and dressed herself, but that somebody else performed the cleaning, laundry, and shopping. (*Id.*)  Physical examination revealed no abnormalities and full range of motion. (*Id.* at 226–27.)  Dr. Southard diagnosed cervical spine pain and concluded that Campusano showed "no limitation with regard to physical activity." (*Id.* at 227.)

### D.  Dr. Toula Georgiou, Ph.D.

On May 26, 2011, Toula Georgiou, Ph.D., performed a psychiatric consultative exam and intelligence evaluation. (*Id.* at 258–65.)  Campusano reported chronic pain and fibroids, and complained that she suffered from difficulty falling asleep, loss of appetite, depression, and fatigue. (*Id.* at 258.)  Her mental status examination indicated lethargy, monotonous speech, coherent and goal-oriented thought process, dysphoric affect, and below average to borderline cognitive functioning. (*Id.* at 259.)  Although she reported being able to dress, bathe, groom herself, and cook, she indicated that she had difficulty with money management, cleaning, doing laundry, and shopping. (*Id.* at 260.)  Moreover, Campusano reported that she does not drive and uses public transportation only to travel on known routes. (*Id*.)  Dr. Georgiou conducted the Wide Range Achievement Test, Fourth Edition, which revealed that Campusano's reading and

decoding skills were at a kindergarten level. (*Id.* at 263.) She also administered the Test of

Nonverbal Intelligence-3, on which Campusano scored 66. (*Id.*) Dr. Georgiou's behavioral

observations revealed nothing extraordinary apart from slow impulsivity and speed of response.

(*Id.*) Dr. Georgiou recorded that Campusano may have difficulty maintaining a regular schedule,

learning new tasks, performing some complex tasks, and making vocational-type decisions, but

indicated that she is able to follow and understand simple directions and perform some simple

tasks independently. (*Id.* at 264.) Dr. Georgiou noted that Campusano's results were consistent

with psychiatric difficulties and apparent borderline intellectual functioning. (*Id.*) She

ultimately diagnosed adjustment disorder with depressed mood, borderline intellectual

functioning, and pain, recommended continued treatment, and indicated that Campusano's

prognosis was fair. (*Id.* at 264.)

### E.  Dr. M. Graff, Ph.D

On August 12, 2011, M. Graff, Ph.D., a state agency psychological consultant, reviewed

Campusano's medical record and completed a Psychiatric Review Technique form to be used as

evidence in the Commissioner's residual functional capacity determination. (*Id.* at 275–95.) Dr.

Graff reported that Campusano had recurrent and moderate major depressive disorder, and he

assessed her mental limitations against the requirements of Listing 12.04 (Affective Disorders)

of 20 C.F.R. § 404, subpart P, Appendix 1. (*Id.* at 291−95.) Regarding functional limitations,

Dr. Graff checked boxes indicating that Campusano had: mild restriction of activities of daily

living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining

concentration, persistence, or pace; and no repeated episodes of deterioration of an extended

duration. (*Id.* at 287.) Based on these findings, Dr. Graff found that the "[e]vidence does not

establish the presence of the [Listing 12.04, paragraph C diagnostic] criteria" for affective disorders.  (*Id.* at 288.)

Dr. Graff also completed a Mental Residual Functional Capacity Assessment form.  (*Id.* at 291–95.)  In the Assessment, Dr. Graff indicated that Campusano was not significantly limited in her ability to: remember locations, understand and remember very short and simple instructions; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond to criticism from supervisors; get along with coworkers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and be aware of normal hazards and take appropriate precautions.  (*Id.* at 291–92.)  On the other hand, Dr. Graff found that Campusano was moderately limited in her ability to:  understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods of time; perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions from her psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in her work setting; and set realistic goals or make plans independently.  (*Id.*)  Dr. Graff further indicated that Campusano was markedly limited in her ability to travel in unfamiliar places or use public transportation.  (*Id.* at 292.)

Ultimately, Dr. Graff remarked that the objective medical evidence contained within the record "does not fully support [Campusano's] psychiatric allegations," and though she had some psychiatric and cognitive limitations, "they would not necessarily interfere" with her "ability to

function" in a work setting. (*Id.* at 293.) Specifically, Dr. Graff alluded to the fact that the more recent Woodhull reports fail to reflect marked psychiatric-related limitations, and that her "[a]ttention, concentration and memory are sufficient for simple and routine repetitive tasks in a low demand setting." (*Id.*)

## II. Procedural Background

On December 22, 2011, Campusano applied for Social Security disability insurance benefits, claiming that she had been disabled since March 22, 2010, due to severe memory loss, headaches, vision impairment, insomnia, and panic attacks. (*Id.* at 115–21, 133.) The Commissioner denied Campusano's application on August 12, 2011. (*Id.* at 53.) The Disability Determination states that "[e]xtensive hospital investigation of the claimants allegations of headaches, dizziness and tinnitus failed to reveal a medically determinable cause of these symptoms therefore the claimants statements are found not to be credible." (*Id.* at 58.)

Campusano then requested a hearing, which was held before ALJ Ronald Bosch on November 14, 2012. (*Id.* at 32–52.) In a decision dated January 22, 2013, the ALJ found that Campusano was not disabled and denied her benefits. (*Id.* at 10–31.) He found that although Campusano had the following severe impairments: adjustment disorder with depressed mood, borderline intellectual functioning, prolonged PTSD, cervical spine pain, cataracts in both eyes, and headaches, these "impairments do not preclude all work activities." (*Id.* at 18−19 (emphasis in original).) The ALJ assigned "little weight" to the opinion of Dr. Fernandez, Campusano's treating physician, because he found that it was "not supported by the evidence." (*Id.* at 23.) He concluded that Campusano "has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except the claimant is limited to (on a sustained basis) understanding, remembering, and carrying out simple tasks and instructions" and that "there are

14

jobs that exist in significant numbers in the national economy that the claimant can perform."
(*Id.* at 20−27.)

The ALJ's decision became final on February 14, 2014, when the Appeals Council declined Campusano's request to review the matter. (*Id.* at 1–6.) Campusano then requested review from this Court, alleging that the ALJ's decision was not supported by substantial evidence and was based on errors of law. (Compl. (Doc. No. 1) at ¶ 13.) Defendant maintains that the ALJ's "determination was based upon application of the correct legal standards and is supported by substantial evidence." Both Campusano and defendant have filed motions for judgment on the pleadings. (Def.'s Notice of Motion for Judgment on the Pleadings (Doc. No. 19); Def.'s Mem. Support of Motion for Judgment on the Pleadings ("Def.'s Br.") (Doc. No. 20) at 5; Pl.'s Notice of Motion for Judgement on the Pleadings (Doc. No. 21).)

## DISCUSSION

### I.  Standard of Review

#### a.  Judicial Review of a Denial of Social Security Benefits

In reviewing the final determination of the Commissioner, a court does not determine *de novo* whether a claimant is disabled. *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, the Court "may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "'[S]ubstantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks omitted). "If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld." *Stemmerman v. Colvin*, No. 13-CV-241, 2014 WL 4161964, at *6 (E.D.N.Y. Aug. 19, 2014) (citing 42 U.S.C. § 405(g)). "The substantial-evidence test applies not only to the Commissioner's factual findings, but also to inferences to be drawn from the facts." *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 421 (S.D.N.Y. 2010). "This deferential standard of review does not apply, however, to the ALJ's legal conclusions." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 342 (E.D.N.Y. 2010). Rather, "[w]here an error of law has been made that might have affected the disposition of the case[,] . . . [an ALJ's] failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).

**b. Eligibility for Disability Benefits**

To be eligible for disability insurance benefits, a claimant must show that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore, the claimant's "physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Social Security Administration's regulations require a five-step analysis for determining whether a claimant is disabled:

> [(1)] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

> [(2)] If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.

> [(3)] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled.

> [(4)] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.

> [(5)] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (alteration in original) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1520, 416.920. At the fourth step, the ALJ must base his assessment of the claimant's residual functional capacity ("RFC") "on all relevant medical and other evidence, such as physical abilities, mental abilities, and symptomology, including [subjective complaints of] pain and other limitations that could interfere with work activities on a regular and continuing basis." *Castillo v. Colvin*, No. 13-CV-5089, 2015 WL 153412, at *11 (S.D.N.Y. Jan. 12, 2015) (citing 20 C.F.R. § 1545(a)(1)–(3)). The claimant bears the burden of proof in the first four steps of the sequential inquiry and the burden shifts to the Commissioner in the last. *See Talavera*, 697 F.3d at 151.

## DISCUSSION

Campusano contends that the ALJ erred in: (1) discounting Dr. Fernandez's opinion; (2) discounting Campusano's credibility on the basis that she failed to correct her tax records; and

(3) relying on the Medical Vocational Guidelines at step five. (Pl.'s Mem. of Law in Supp. of Cross-Mot. for J. on the Pleadings ("Pl.'s Br.") (Doc. No. 22) at 20−27.) Each of these contentions is discussed below.

## I. Treating Physician Rule

Campusano first argues that the ALJ should have given controlling weight to the opinion of Dr. Fernandez, her treating psychiatrist. (Pl.'s Br. at 18 (citing 20 C.F.R. §§ 404.1527(c), 416.927(c)). Specifically, Campusano contends that the ALJ should have given more weight to Dr. Fernandez's finding that Campusano was completely unable to function independently outside the area of her home. (*Id.*) Though the ALJ did not err in determining that Dr. Fernandez's opinion was not to be assigned controlling weight, he failed to apply the substance of the treating physician rule.

In determining whether the ALJ's decision was supported by "substantial evidence," "[t]he law gives special evidentiary weight to the opinion of the treating physician." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). Specifically, the treating physician rule, as stated in the regulations set forth by the Commissioner in 20 C.F.R. § 404.1527, provides that:

> Generally, [the SSA] give[s] more weight to opinions from [a claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2). A treating physician's opinion on the "nature and severity" of the plaintiff's impairments is generally given "controlling weight," unless the opinion is either (1) not "well-supported by medically accepted clinical and laboratory diagnostic techniques . . . [or (2)] inconsistent with the other substantial evidence in [the plaintiff's] case record." *Id.*; *see,*

*e.g.*, *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (affirming the ALJ's decision where "the substance of the [R]ule was not traversed").

The opinion of a treating physician is especially important in the mental health context, as "mental disabilities are difficult to diagnose without subjective, in-person examination." *Roman v. Astrue*, No. 10-CV-3085, 2012 WL 4566128, at *18 (E.D.N.Y. Sept. 28, 2012) (quoting *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 342 (E.D.N.Y. 2010)); *see Santana v. Astrue*, No. 12-CV-0815, 2013 WL 1232461, at *14 (E.D.N.Y. Mar. 26, 2013) (noting that a patient's in-person subjective complaints to a physician are particularly important "for diagnoses of mental disorders because unlike orthopedists, for example, who can formulate medical opinions based upon objective findings derived from objective clinical tests, scans or x-rays, a psychiatrist typically treats the patient's subjective symptoms or complaints about those symptoms"). "The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient" *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam)); *see also Selian*, 708 F.3d at 419 (noting that the Second Circuit has "cautioned that ALJs should not rely heavily upon the findings of consultative physicians after a single examination"); *Sanchez v. Colvin*, No. 13-CV-929, 2014 WL 4065091, at *12 (E.D.N.Y. Aug. 14, 2014) (remanding where the ALJ assigned less weight to a treating physician than to a consultative examiner who had only performed one examination of the claimant).

If an ALJ declines to assign a treating physician's opinion controlling weight, "he must provide 'good reasons' for declining to do so, as well as 'good reasons' for according those opinions whatever weight he assigns to them." *Castillo*, 2015 WL 153412, at *20 (quoting

*Clark*, 143 F.3d at 118); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"). In doing so, the ALJ must consider:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the [SSA's] attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(c)(2)-(6)). "[W]here an ALJ does not appear to have taken into consideration the factors required by the treating physician rule, the Court cannot find that the ALJ's determination is supported by substantial evidence." *Sanchez v. Colvin*, 2014 WL 4065091, at *12; *see also Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) ("Failure to provide such good reasons for [declining to credit] the opinion of a claimant's treating physician is a ground for remand.").

In light of the conflicting evidence in the record, the ALJ acted properly within his discretion to treat Dr. Fernandez's opinion as non-controlling. *See Mongeur*, 722 F.2d at 1039 (concluding that the "ALJ properly weighed the conflicting medical evidence" in light of the "accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence, and the report of a consultative physician may constitute such evidence") (internal citation omitted). After outlining Dr. Fernandez's findings, including her ultimate conclusion that Campusano had "a complete inability to function independently outside the area of her home," the ALJ explained,

> Dr. Fernandez's conclusions . . . are not supported by the evidence. For instance, Dr. Fernandez reported that the claimant has had severe memory problems since the age of 12, but the claimant worked as a housekeeper for 10 years, which would seem difficult to do if the claimant's memory was as poor as alleged. Further, Dr. Fernandez opined that the claimant has severe social functioning problems, but the claimant reported that she has friends and likes to socialize. Additionally, Dr. Fernandez opined that the claimant

has a complete inability to function outside her own home, but the claimant reported that she can travel independently with known routes, and she was able to travel one hour by train by herself for a consultative examination.

(Admin. R. at 23 (internal citations omitted).)  The ALJ thus gave "little weight" to Dr. Fernandez's conclusions "because they [we]re not supported by the evidence."  (*Id.*)[2]

However, review of some of the evidence that the ALJ cites as contradicting Dr. Fernandez's conclusion indicates that the analysis is not clear cut.  For example, while the ALJ cited Dr. Georgiou's psychiatric evaluation as evidence that Campusano could travel "one hour by train by herself for a consultative examination," Dr. Georgiou simply stated that Campusano "traveled an hour to the evaluation by train," not that she traveled alone.  (*Id.* at 258.)

In addition, while the ALJ provided several examples of how the evidence contradicted Dr. Fernandez's findings, it appears that the ALJ failed to consider, as the second factor requires, the evidence within the record that *supports* her findings.  The ALJ specifically disregarded three of Dr. Fernandez's conclusions: 1) Campusano has had severe memory problems since the age of twelve; 2) Campusano has severe social functioning problems; and 3) Campusano has a complete inability to function outside her own home.  While the ALJ cited his reasons for giving little weight to these conclusions, he did not review the evidence within the record that supports Dr. Fernandez's findings.  For instance, Dr. Graff noted that Campusano had "[s]ome difficulties w[ith] independent travel and going out alone (*id.* at 293), before concluding that Campusano "can do some travel."  (*Id.* at 293.)  Dr. Miller diagnosed Campusano with agoraphobia and noted her fear of getting lost when outside alone.  (*Id.* at 183−86 ("She does not do laundry alone

[2] At the outset, the Court notes that the ALJ properly considered the objective physical medical evidence with respect to Campusano's exertional impairments in concluding that she could perform medium-level exertional work. The Court therefore focuses its analysis on the ALJ's treatment of the objective medical evidence pertaining to her *mental* non-exertional impairments.  *See* 20 C.F.R. § 404.1569a(a) ("Limitations or restrictions which affect your ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered nonexertional."); *id.* § 404.1569a(c)(1)(i) (noting that "difficulty functioning because [the claimant is] nervous, anxious, or depressed" qualifies as a non-exertional impairment").

because she is afraid of going to a public Laundromat by herself. She also goes shopping but not alone. She says she sometimes takes buses by herself as long as the trip is not too far. She does not feel she can go long distances on a bus by herself or take a subway because of fear of becoming lost.").) Multiple evaluations noted that Campusano received assistance with activities outside of her home like laundry and shopping. (*See, e.g.*, *id.* at 185, 260.)

Thus, there is reasonable basis for doubt that the ALJ applied the correct legal standard under the treating physician rule which requires the Court to remand the proceedings, albeit for the limited purpose of directing the ALJ to consider the evidence in the record supporting Dr. Fernandez's conclusions, and to re-consider the consistency of the opinion with the record as a whole. *See Pena v. Comm'r of Soc. Sec.*, No. 08-CV-3304, 2010 WL 4340449, at *5 (E.D.N.Y. Oct. 22, 2010); *Hach v. Astrue*, No. 07-CV-2517, 2010 WL 1169926, at *11 (E.D.N.Y. Mar. 23, 2010) (holding that remand was appropriate where the ALJ found the treating doctor's opinion "inconsistent" with the "objective evidence," but did not address the remaining factors that supported the doctor's opinion).

## II. Credibility Determination

Campusano also challenges the ALJ's finding that Campusano's testimony was not fully credible because, *inter alia*, Campusano testified that she stopped working on March 22, 2010 and used this date in her application for disability benefits, but "it appears the claimant earned over $17,000 since the alleged onset date, and she was unable to explain the earnings." (Admin. R. at 26.) Tax records for 2010 and 2011 indicate that Campusano earned money through self-employment after March 22, 2010, but Campusano could not explain the earnings and failed to correct the records with the IRS or Social Security Administration District Office within the 60-

day period she was given by the ALJ. (*Id.*) Campusano argues that the ALJ erred in taking these tax records into account to assess her credibility.

"The ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). Where the ALJ rejects a plaintiff's testimony in light of objective medical evidence and other factors he deems relevant, he must explain that decision "with sufficient specificity to enable the [reviewing] Court to decide whether there are legitimate reasons for the ALJ's disbelief" and whether his decision is supported by substantial evidence. *Calzada v. Astrue*, 753 F. Supp. 2d 250, 280 (S.D.N.Y. 2010) (quoting *Fox v. Astrue*, No. 6:05-CV-1599, 2008 WL 828078, at *12 (N.D.N.Y. Mar. 26, 2008)).

Here, the ALJ determined that Campusano was not credible because her complaints were undermined by, *inter alia*, the fact that she reported income from self-employment on her tax records in 2010 and 2011. (*See* Admin. R. at 26.) In fact, despite denying self-employment in either of those years, her tax records indicate that she earned over $17,000 during that time. (*See id.* at 48–52.) Giving Campusano the benefit of the doubt, and in an effort to allow her fair consideration, the ALJ then extended her a minimum of 60 days to correct those tax records – despite the fact that her non-attorney representative had only requested one month. (*See id.* at 51.) The ALJ specifically instructed Campusano's counsel to aid her in her efforts with the IRS, and counsel affirmed that he would do so. (*Id.*) However, neither Campusano nor her representative corrected the records or provided evidence to explain them. (*Id.* at 26.)

Campusano argues that this failure to correct or explain her tax records should not have been considered in evaluating her credibility because of her "limited education, [] inability to

speak, read, or write in English, mental illness, and [] borderline intellectual functioning." (Pl.'s Br. at 24.) However, Campusano was represented at the administrative hearing by a non-attorney representative who told the ALJ that he would assist Campusano with correcting the earning records issue. (Admin. R. at 51.) In addition, as discussed by defendant, earning records are properly considered as "evidence for the purpose of proceedings before the Commissioner of Social Security or any court of the amounts of wages paid to, and self-employment income derived by, an individual and of the periods in which such wages were paid and such income was derived." 42 U.S.C. § 405(c)(3). (Def.'s Reply Mem. in Supp. ("Def.'s Reply Br.") (Doc. No. 23) at 5.)

Campusano's failure to explain her earnings was only one of the factors upon which the ALJ rested his conclusion that "the severity of the claimant's impairments are less severe than alleged by the claimant." (Admin. R. at 26.) The ALJ found that Campusano's "work activity after the alleged onset date, the claimant's inconsistent testimony and prior statements, the diagnostic tests showing normal findings, and the claimant's physical examinations showing mostly normal findings all indicate that the severity of the claimant's impairments are less severe than alleged by the claimant." (*Id.*) Even disregarding the tax evidence, the ALJ's determination of plaintiff's credibility was reasonable in light of the factors required by 20 C.F.R. 404.1529(c) and substantial evidence exists within the record to support his determination. *See Calabrese v. Astrue*, 358 F. App'x 274, 277 (2d Cir. 2009) ("[W]here the ALJ's decision to discredit a claimant's subjective complaints is supported by substantial evidence, we must defer to his findings.").

III.    **Reliance on Medical Vocational Guidelines at Step Five**

Lastly, Campusano argues that the ALJ erroneously applied the Medical Vocational Guidelines to conclude that she was not disabled.  She states that the ALJ "ignored all the evidence demonstrating that Ms. Campusano has 'marked' overall limitation in her cognitive functioning" and erred in finding that her mental impairments did not significantly impair her ability to do medium work.  (Pl.'s Br. at 25−26.)  She further argues that in light of the medical opinion evidence, the ALJ was required to call upon a vocational expert.  (*Id.* at 26−27.)  Because remand is necessary for re-consideration of the weight to give Dr. Fernandez's opinion in light of the treating physician rule, the Court does not decide whether the ALJ was required to call upon a vocational expert.

In satisfying the SSA's burden in the fifth step, the Commissioner:

> May rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid."  The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy.  Generally the result listed in the Grid is dispositive on the issue of disability.

*Suarez v. Colvin*, No. 14-CV-6506, 2015 WL 2088789, at *25 (S.D.N.Y. May 6, 2015) (quoting *Zorilla v. Chater,* 915 F. Supp. 662, 667 (S.D.N.Y. 1996)).  However, "relying solely on the Grids is inappropriate when nonexertional limitations significantly diminish plaintiff's ability to work so that the Grids do not particularly address plaintiff's limitations." *Vargas v. Astrue*, 10-CV-6306, 2011 WL 2946371, at *13 (S.D.N.Y. July 20, 2011) (internal quotation marks omitted); *Lomax v. Comm'r of Soc. Sec.*, No. 09-CV-1451, 2011 WL 2359360, at *3 (E.D.N.Y. June 6, 2011) ("Sole reliance on the grids is inappropriate, however, where a claimant's

nonexertional impairments significantly limit the range of work permitted by his exertional limitations.") (internal quotation marks omitted).

Instead, where a claimant's "nonexertional limitations . . . significantly limit the range of work permitted by his exertional limitations, the ALJ is required to consult with a vocational expert" to identify jobs that exist in the national economy that the claimant can perform. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (internal quotation marks omitted); *Selian*, 708 F.3d at 421 ("We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert.").

"[A]pplication of the grid guidelines and the necessity for expert testimony must be determined on a case-by-case basis." *Bapp v. Bowen*, 802 F.2d 601 (2d Cir. 1986). Numerous courts within this Circuit have found that moderate limitations imposed by mental impairments do not automatically significantly limit employment opportunities and that reliance upon the Grids is not improper in such cases. *Lawler v. Astrue*, 512 F. App'x 108, 112 (2d Cir. 2013) ("Because the ALJ had substantial evidence to conclude that Lawler's nonexertional impairments did not significantly limit the range of work he could perform, she was likewise under no obligation to identify specific jobs in the national economy that matched Lawler's residual functional capacity."); *Whipple v. Astrue*, 479 F. App'x 367, 371 (2d Cir. 2012); *Zabala*, 595 F.3d at 411 ("The ALJ found that Petitioner's mental condition did not limit her ability to perform unskilled work, including carrying out simple instructions, dealing with work changes, and responding to supervision. Thus, her nonexertional limitations did not result in an additional loss of work capacity, and the ALJ's use of the Medical–Vocational Guidelines was permissible."); *Arzuaga v. Colvin*, No. 13-CV-6847, 2014 WL 7180438, at *7 (S.D.N.Y. Dec.

11, 2014); *Sipe v. Astrue*, 873 F. Supp. 2d 471, 481 (N.D.N.Y. 2012) (Finding that despite the claimant's mild and moderate limitations in all relevant areas, the hearing officer's conclusion that the claimant had "no substantial loss of ability" to perform unskilled work was supported by substantial evidence, and that the hearing officer was not required to consult a vocational expert.); *Cotto v. Astrue*, No. 10-CV-9005, 2012 WL 2512054, at *7 (S.D.N.Y. June 28, 2012); *Buschle v. Astrue*, No. 5:10-CV-1535, 2012 WL 463443, at *5 (N.D.N.Y Feb. 13, 2012); *Wallis v. Comm'r of Soc. Sec.*, No. 09-CV-1075, 2010 WL 3808303, at *12 (N.D.N.Y. Aug. 5, 2010) report and recommendation adopted, No. 09-CV-1075, 2010 WL 3806824 (N.D.N.Y. Sept. 22, 2010) ("Although there is some evidence of mild or moderate limitations imposed by Plaintiff's mental impairments, there is no indication that those limitations so narrow Plaintiff's possible range of work so as to deprive her of a meaningful employment opportunity. Accordingly, this Court finds no reversible error in connection with the ALJ's reliance upon the Grids.").

Because the Court finds that remand is necessary for the limited purpose of reconsideration of Dr. Fernandez's findings in light of the treating physician rule, the Court cannot fully address whether the ALJ properly conducted step five of the analysis. In the event that the ALJ credits Dr. Fernandez's findings differently on remand so as to find that Campusano's non-exertional impairments significantly impair her ability to do medium work, he should consult a vocational expert to identify jobs that exist in the national economy that Campusano can perform in compliance with the aforementioned Second Circuit case law.

## IV. Remand

"Sentence four of Section 405(g) provides district courts with the authority to affirm, reverse, or modify a decision of the Commissioner 'with or without remanding the case for a rehearing.'" *Butts v. Barnhart*, 388 F.3d 277, 385 (2d Cir. 2004) (quoting 42 U.S.C. § 405(g)).

Remand is "appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, further findings would . . . plainly help to assure the proper disposition of [a] claim." *Kirkland v. Astrue*, No. 06-CV-4861, 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008) (quoting *Butts*, 388 F.3d at 386). Given the need for re-consideration of the weight to give Dr. Fernandez's opinion, the decision is remanded for further proceedings consistent with this opinion.

## CONCLUSION

For the reasons stated herein, defendant's motion for judgment on the pleadings is granted in part and denied in part, and Campusano's cross-motion for judgment on the pleadings is granted in part and denied in part. The matter is REMANDED to the Commissioner of Social Security for further proceedings consistent with this opinion.

The Clerk of Court is respectfully directed to enter judgment accordingly and close this case.

SO ORDERED.

*Roslynn R. Mauskopf*

Dated: Brooklyn, New York
       March 28, 2016

_____
ROSLYNN R. MAUSKOPF
United States District Judge